UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
ROBERT LITRAS,

                      Plaintiff,                      **MEMORANDUM and ORDER**

       -against-                        02-CV-5168 (SLT)

LONG ISLAND RAILROAD,

                      Defendant.
--------------------------------------------------------------------x
**TOWNES, United States District Judge:**

       This is an action brought by a locomotive engineer to recover damages for injuries sustained when the train he was operating collided with a maintenance crane. In April 2005, after a week-long trial on the issue of causation and damages, a jury returned a verdict in favor of plaintiff, but awarded him only $75,000 for past pain and suffering, $25,000 for future medical expenses, and nothing for future pain and suffering or for past or future wage losses. Plaintiff now moves for a new trial pursuant to Fed. R. Civ. P. 59, arguing (1) that the jury's verdict was against the weight of the evidence, (2) that the verdict was internally inconsistent and (3) that the Court's ruling on one of defendant's motions *in limine* was erroneous. For the reasons set forth below, plaintiff's motion is denied.

## BACKGROUND

       In September 2002, plaintiff Robert Litras, a locomotive engineer employed by defendant Long Island Railroad, brought this action pursuant to the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.*, to recover for injuries he sustained in a railroad accident on May 17, 2001. In April 2003, defendant stipulated that it would not contest liability for compensatory damages. Thereafter, the only issues remaining for trial were which, if any, of

plaintiff's several injuries were caused, even in the slightest, by defendant's negligence, and the amount necessary to compensate plaintiff for said injuries.

Defendant's Second Motion *in Limine*

Prior to the start of the April 2005 trial in this action, the parties made several motions *in limine*, only one of which is relevant herein. That motion – defendant's second motion *in limine*, filed and dated March 9, 2005 – sought to preclude plaintiff from offering "evidence or testimony that the LIRR improperly refused to authorize . . . back surgery . . . or . . . a discogram of the plaintiff . . . ." Defendant's Memorandum of Law in Support of its Motion *in Limine*, dated Mar. 9, 2005, at 9. Defendant argued that claims concerning the authorization of medical care were "minor disputes" under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*, and that this Court lacked subject matter jurisdiction over such disputes. *Id.* at 1. In response, plaintiff stated that he was not raising a claim concerning defendant's refusal to authorize the surgery or the discogram, but was seeking "to present evidence of these facts regarding his requests for authorization of surgery, and the subsequent failure of the Defendant to either approve or deny said requests" in order to explain why plaintiff had not yet had surgery. Memorandum in Support of Plaintiff's Motion to Oppose Defendant's Motion *in Limine*, dated Mar. 16, 2005, at 2.

On April 4, 2005, this Court granted defendant's motion, thereby precluding plaintiff from introducing evidence that the defendant had refused to authorize the discogram and had not yet ruled on plaintiff's request for authorization to perform surgery on plaintiff's lumbar spine. Immediately thereafter, the parties proceeded to trial in this case. Because plaintiff's first two arguments upon the instant motion for a new trial are fact-specific, it is necessary to summarize the evidence adduced at trial in some detail.

On May 17, 2001, plaintiff was operating the lead unit of a multiple-unit, electrically powered train on an eastbound run to Far Rockaway Station (T. 499, 501).[1]  As his train was approaching a crane operating on an adjacent track, the crane unexpectedly swung into the path of plaintiff's train (T. 502).  Although the train was traveling at only 25 miles per hour, the impact tore a hole in the roof of the car in which plaintiff was seated.  *Id.*

At the time of the collision, plaintiff was seated behind a console in a booth located at the very front of the train, holding down a "controller" which had to be continuously depressed to prevent the train from stopping automatically (T. 500).  Plaintiff was not struck by the crane itself, but was thrown forward into a standing position (T. 502-04).  His hand came off the controller, activating the emergency brakes which, together with the force of impact, brought the train to a sudden halt (T. 502).

Plaintiff testified that, even before he fell back into his chair, he felt back pain unlike any he had felt before (T. 504).  However, when an ambulance arrived, plaintiff told the paramedics that he did not want a backboard.  *Id.*  Indeed, plaintiff did not need to be carried from the train, but climbed down an egress ladder and walked to an ambulance, in which he sat upright for the ten-minute ride to Franklin General Hospital (T. 505-06, 551).

There, plaintiff was examined in the emergency room.  Although plaintiff recalled complaining of throbbing pain across his lower back, he was not even X-rayed (T. 506-07).  Instead, he was provided with a single pill containing a muscle relaxant and a pain killer and released (T. 553).

---

[1]Numbers in parentheses, preceded by the letter "T," refer to pages in the trial transcript which has been docketed along with this Memorandum and Order.

The next morning, plaintiff had pain in his neck, which radiated "down the shoulder and into the bicep," and a "throbbing and pinching" sensation in his fingertips (T. 514). After attending a meeting with LIRR's General Superintendent of Transportation, plaintiff visited his family doctor, who prescribed Skalaxin (a prescription pain killer) and recommended that plaintiff "take off at least seven days as a precaution" (T. 511). Plaintiff took the Skalaxin for approximately two weeks, but never refilled the prescription (T. 555).

Shortly after the accident, plaintiff's union referred him to an orthopedist, Dr. Ajemian, who prescribed physical therapy (T. 515, 569). This therapy, which involved "massage, heat massage [and] ultrasound," made plaintiff's neck feel "considerably better" (T. 517-18). Nonetheless, plaintiff did not return to work until September 10, 2001 – 115 days after the accident.

During this 115-day period, plaintiff was examined regularly by defendant's doctors. In August 2001, Dr. Ajemian told plaintiff that the railroad wanted him to return to light duty (T. 558). Plaintiff responded that he did not feel ready to do so. Dr. Ajemian did not tell plaintiff not to return to work, but said, "[T]hen, we'll deal with the railroad" (T. 559). It is not clear what Dr. Ajemian meant by this comment or what he did thereafter.

On September 5, 2001, plaintiff started seeing a new orthopedist, Dr. Jeffrey Meyer. Although plaintiff claimed that he stopped seeing Dr. Ajemian because the doctor kept him waiting for hours (T. 522), Robert Willis – the Health and Welfare Secretary of plaintiff's union and the person who referred plaintiff to Dr. Meyer – testified that plaintiff had "wanted a second opinion" (T. 364). Dr. Meyer admitted having "many" patients who attempted to "milk [an injury] for whatever it is worth," but opined that plaintiff was not such a patient because plaintiff "wanted to work" (T. 190-91). However, plaintiff, who was examined by Dr. Meyer's partner,

4

Dr. Yerys, upon his initial visit to Dr. Meyer's office, testified that he "more than likely" told Dr. Yerys that he was not ready to return to work (T. 561). Plaintiff also testified that he "probably" said that he did not want to work light duty during his first meeting with Dr. Meyer (T. 562).

Following his September 5, 2001, examination of plaintiff, Dr. Yerys noted that, with physical therapy, plaintiff had made "excellent progress in the cervical spine" and had excellent range of motion in his neck (T. 230-31). Plaintiff continued to have numbness and tingling in his right hand and a limited range of motion in the lower spine, but Dr. Yerys did not tell plaintiff that he was unable to perform light duty (T. 231).

Plaintiff saw Dr. Meyer for the first time on October 9, 2001. Plaintiff principally complained of numbness in his right hand, but also complained of lower back pain (T. 174). Although plaintiff had a "palpable spasm in his back" (T. 181), Dr. Meyer determined that plaintiff could perform "light duty" (T. 190). Dr. Meyer prescribed a "back hardening" regimen of physical therapy, with a view to returning plaintiff to full duty. *Id.*

Plaintiff returned to Dr. Meyer's office once more on November 27, 2001, about the time he returned to work full time. By then, his cervical and lumbar strains were resolved (T. 193), and Dr. Meyer cleared plaintiff to return to full duty. After that, plaintiff did not return to Dr. Meyer's office for more than six months.

When Dr. Meyer next examined plaintiff, on June 7, 2002, plaintiff was working out at the gym three or four times a week (T. 198-99). Plaintiff was doing light weight training, using machines such as the shoulder press, and doing such cardiovascular exercises as riding the stationary bicycle (T. 566). Plaintiff reported "no significant neck pain," but had "residual midline low back pain" (T. 198, 241). The back pain was not "significantly different" than it had been in the middle of 2001 (T. 198-99, 241), so Dr. Meyer referred plaintiff to a Dr. Fryman for

an epidural steroid injection. While plaintiff testified that the injection was very painful (T. 519), Dr. Meyer recalled that plaintiff reported "significant improvement" following the injection (T. 202).

By November 15, 2002, plaintiff's principal complaint was of shoulder pain which, plaintiff reported, was worse than his back pain which, in turn, was worse than his neck pain. Plaintiff claimed that his symptoms were "significantly worse," and that he had taken to using his other hand to operate the controls of the train (T. 204). While Dr. Meyer testified that it was common "to see a combination of neck and shoulder pain," he admitted that he was "uncertain" as to whether plaintiff's rotator cuff tendinitis was caused by the accident (T. 205, 271).

Dr. Meyer subsequently referred plaintiff to a surgeon, Dr. Marc Chernoff, to discuss surgical options. When Dr. Chernoff first examined plaintiff in January 2003, plaintiff's "worst problem . . . was his lower back followed by his shoulder and neck" (T. 565). Dr. Chernoff determined that plaintiff had a herniated disk between his fourth and fifth lumbar vertebrae (*i.e.*, at L 4-5), a herniated disk between his fourth and fifth cervical vertebrae (*i.e.*, at C 4-5), and a bulging disk at C 5-6 (T. 69). Dr. Chernoff proposed performing surgery on plaintiff's lower back, in which he would remove a portion of the herniated disk and fuse the L 4 and L 5 vertebrae.

Dr. Chernoff did not propose performing surgery on plaintiff's cervical vertebrae. Although Dr. Chernoff stated that physical therapy could not repair damage to cervical disks, he nonetheless suggested that physical therapy could control neck pain:

> Q: Does physical therapy solve a herniated disk problem either in the cervical spine and the neck, does it make the disk go back into place?

> A: No, it really doesn't but it tries to strengthen the muscle so it
> overcompensate[s] for it to see if the symptoms will subside.

(T. 58). Nonetheless, Dr. Chernoff recommended plaintiff discontinue physical therapy because he believed that physical therapy "was not helping" (T. 97).

Toward the end of 2004 – four or five months prior to plaintiff's testimony at trial – plaintiff began to develop "stabbing" pain in his hips and legs (T. 525-26). Nonetheless, even on "bad days," plaintiff was able to go to work (T. 528). Moreover, he testified that he generally felt only "moderate" pain at the start of his work week, and that his pain at work was "not expressly bad," although "it could be exhaustive [sic] at times" (T. 524-25). Plaintiff claimed that, as a result, he did not work much overtime, although he continued to work "a little bit more" than a five-day week (T. 531).

Despite the alleged deterioration in plaintiff's condition in 2004, Dr. Chernoff still did not prescribe physical therapy or epidural injections. Rather, plaintiff simply continued to await the surgery which Dr. Chernoff had recommended. Pursuant to this Court's decision on defendant's second motion *in limine*, plaintiff was precluded from adducing evidence that plaintiff had not yet had the surgery because defendant had not yet authorized it. This Court's order did not preclude plaintiff from explaining – as his counsel had at a March 4, 2005, pre-trial conference – that he was living paycheck to paycheck and could not afford surgery, but plaintiff did not offer any such explanation.

At trial, the exact nature and cause of the injury to plaintiff's neck and lower back was the subject of conflicting expert testimony. Dr. Chernoff testified that MRIs taken in June 2001 showed a tear in the annulus of L 4-5 – the material comprising the outside of the intervertebral

disk between plaintiff's fourth and fifth lumbar vertebrae (T. 71-72). Dr. Chernoff further testified that the MRIs showed fluid around the tear, and that this was evidence that the tear was recent (T. 72). However, Dr. Chernoff admitted that, absent evidence of such fluid, it was "impossible to tell" how recent (or acute) the tear might be (T. 131).

Dr. Chernoff conceded that, prior to the accident, plaintiff had "mild desiccation" at L 4-5 – a normal degenerative process which might itself lead to a bulging of the disk (T. 126, 152). He also testified that plaintiff had a congenital abnormality of the transverse process at L-5, which limited plaintiff's mobility at the L 5/S 1 level. In addition, Dr. Chernoff testified that any complaints of leg numbness or pain were not attributable to the L 4-5 disk (T. 293).

Dr. Jay Hammel, a diagnostic radiologist whose videotaped deposition was admitted at trial, testified that the June 2001 MRIs showed a small disk herniation at the L 4-5 level (D. 22).[2] Dr. Hammel stated that the herniation was "pressing mostly on the thecal sac," with "perhaps some slight encroachment of that right nerve root" (D. 23). However, Dr. Hammel conceded that the doctor who originally interpreted the MRIs – Dr. Hammel's partner, Dr. Kaufman – had not noted any encroachment. Dr. Hammel testified that this omission suggested that Dr. Kaufman did not believe any encroachment was present (D. 55-56).

Dr. Hammel interpreted one of the MRIs as showing a radioannular tear in the L 4-5 disk, and fluid seeping out of it (D. 31). However, Dr. Hammel testified that the MRIs also showed disk desiccation at the L 4-5 level, and that this degenerative condition existed prior to the accident (D. 50). Dr. Hammel testified that such desiccation could "lead to [a] radioannular tear," and that it was "impossible to determine how the tear or disk herniation is related to the

---

[2]Numbers in parentheses, preceded by "D," refer to pages in the transcript of Dr. Hammel's March 17, 2005, deposition.

desiccation" based solely on review of the films (D. 51). Dr. Hammel also stated that he could not "date the disk herniation," but could only opine whether the herniation was present or not present (D. 67).

Dr. Hammel also testified that a June 2001 MRIs of the cervical spine showed a "small disk herniation" at the C 4-5 level, which was "mildly encroaching or touching the exiting right nerve root at that level" (D. 61). The same MRIs also showed a "mild disk bulge" at the C 5-6 level, but that bulge was not encroaching on either nerve root (D. 34-35, 38, 61).

Defendant's expert, Dr. Brian Hainline, testified that the June 2001 MRIs did not show an annular tear, but showed both disk desiccation and a "disk prolapse" at L 4-5 (T. 635-36). Dr. Hainline testified that the disk desiccation existed prior to the accident (T. 641-42), and that this condition, combined with the stress of normal activities, could have caused the disk prolapse, or bulging, observed in the MRIs (T. 643). That testimony was supported to some degree by the history Dr. Hainline took from plaintiff, in which plaintiff stated that he had always had some lower back discomfort (T. 731). In addition, Dr. Hainline testified that although the prolapse encroached upon the thecal sac, this encroachment was too mild to cause pain to plaintiff (T. 638-39), and that the pain radiating down plaintiff's left leg was not caused by the disk prolapse at L 4-5 (T. 640, 656).

Dr. Hainline also testified that the MRIs showed a disk prolapse at C 4-5, and a "mild bulging disk" at C 5-6 (T. 642). The doctor testified that the disk bulge did not impinge on any nerves, and that the prolapse at C 4-5 could not be causing the symptoms in plaintiff's fingers (T. 645). Dr. Hainline believed that plaintiff, who had made "subjective complaints of pain" during his December 2003 examination (T. 634), had been injured as a result of the accident (T. 677).

However, the doctor opined that plaintiff had "myofascial pain" – "psychologically mediated [and] . . . not caused from an inflammation, . . . from mechanical impingement, or entrapment of a nerve" (T. 652).

Dr. Hainline conceded that the cervical disk prolapse could have been caused by the accident. However, he also testified that both epidural injections and physical therapy could work "like magic" to alleviate the pain caused by even "small disc herniation" (T. 693-94).

Following summations and this Court's charge, the jury deliberated for slightly more than an hour before returning a verdict in favor of plaintiff. The jury awarded plaintiff $75,000 for past pain and suffering and $25,000 for future medical expenses, but nothing for future pain and suffering or for past or future wage losses. Plaintiff's counsel did not object to this verdict before the jury was discharged. However, almost immediately thereafter, plaintiff's counsel sought and received this Court's permission to move for a new trial.

Plaintiff now moves for a new trial pursuant to Fed. R. Civ. P. 59 on three grounds. First, plaintiff argues that, because there was uncontroverted evidence that plaintiff had missed 115 days of work immediately after the accident, the jury's failure to award plaintiff any damages for loss of earnings was against the weight of the evidence. Second, plaintiff asserts that the verdict was inconsistent because it awarded plaintiff $25,000 for future medical expenses, but nothing for future pain and suffering. Third, plaintiff maintains that the Court's ruling on defendant's second motion *in limine* was erroneous.

## DISCUSSION

Rule 59(a) provides, in pertinent part:

> A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States ....

Despite this broad language, "Rule 59 is not a vehicle for relitigating old issues . . . or otherwise taking a 'second bite at the apple' . . . ." *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998). Rather, "[a] motion for a new trial should be granted when, in the opinion of the district court, the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d. Cir. 1998) (quoting *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992)).

<u>Weight of the Evidence</u>

Plaintiff's first argument for a new trial is that the jury's verdict "was clearly against the great weight of the evidence." Memorandum of Law in Support of Motion for a New Trial ("Pl. Memo") at 4. Rule 59 permits a court to grant a new trial on this basis. *DLC Mgmt. Corp.*, 163 F.3d at 133. Under Rule 59(a), unlike under Fed. R. Civ. P. 50, "a trial judge is free to weigh the evidence himself [or herself], and need not view it in the light most favorable to the verdict winner." *Id.* at 134. However, while a "new trial under Rule 59(a) 'may be granted even if there is substantial evidence supporting the jury's verdict,'" *Manley v. Ambase Corp.*, 337 F.3d 237, 244 (2d Cir. 2003) (quoting *DLC Mgmt. Corp.*, 163 F.3d at 133-34), "a court should rarely disturb a jury's evaluation of a witness's credibility." *DLC Mgmt. Corp.*, 163 F.3d at 134. "A trial judge's disagreement with the jury's verdict alone is insufficient reason to grant a motion for a new trial." *Carrasquillo v. City of Troy*, No. 1:02-CV-012321, 2006 WL 304031, at *1

(N.D.N.Y. Feb. 8, 2006) (citing *Saloomey v. Jeppesen & Co.*, 707 F.2d 671, 679 (2d Cir. 1983)).

Rather, a court should only grant a new trial under Rule 59 "when the jury's verdict is

'egregious.'" *DLC Mgmt. Corp.*, 163 F.3d at 134 (quoting *Dunlap-McCuller v. Reise Org.*, 980

F.2d 153, 158 (2d Cir. 1992)).

The jury's verdict in this case was not "egregious." Plaintiff's principal argument was

that plaintiff had missed at least 115 days of work, but that the jury had not awarded him

damages for lost wages. Pl. Memo at 4. While plaintiff correctly notes that the uncontroverted

evidence at trial established that plaintiff did not work from May 18, 2001(the date after the

accident) until September 10, 2001 (the date plaintiff returned to light duty), there was a

substantial issue as to whether plaintiff's accident-related injuries caused his absence from work.

Although defendant's expert conceded, and the jury concluded, that plaintiff was injured

in the accident, there was evidence to suggest that those injuries were painful but not

debilitating. First, the evidence suggested that plaintiff was not incapacitated even immediately

after the accident itself. He refused a backboard, climbed down a ladder and walked to an

ambulance, in which he sat up for the ten-minute ride to the hospital. At the emergency room he

was quickly released without so much as an X-ray and given a pain killer/muscle relaxant,

suggesting that the emergency room physicians believed he had suffered no more than a sprain.

When plaintiff went to see his family doctor the next day, complaining of neck pain

radiating down his arms, the doctor prescribed only a pain killer. Plaintiff testified that the

doctor recommended that he take at least seven days off, but only "as a precaution" (T. 511).

From this testimony, the jury could infer that plaintiff's own family doctor did not think his

injuries were so severe as to necessitate time off from work, but was willing to accommodate

plaintiff's wishes to remain out on disability. Moreover, within two weeks, plaintiff's pain apparently diminished enough so that plaintiff never renewed the prescription for pain killers.

Plaintiff did not testify that his family doctor even referred him to an orthopedist. Rather, plaintiff went to an orthopedist recommended by his union. Although this doctor – Dr. Ajemian – may have initially certified plaintiff's disability, the jury could fairly have questioned the impartiality of this union-recommended orthopedist. Indeed, the degree to which Dr. Ajemian attempted to accommodate plaintiff's wishes was highlighted by plaintiff's own testimony concerning an August 2001 conversation with the doctor. During that conversation, Dr. Ajemian solicited plaintiff's reaction to the railroad's request that plaintiff be returned to "light duty." When plaintiff indicated that he did not want to return to work, Dr. Ajemian reportedly said, "Then, *we'll* deal with the railroad" (T. 559) (emphasis added). Although the record does not reflect precisely what Dr. Ajemian meant by this comment or what he did thereafter, the jury could infer that Dr. Ajemian viewed himself as an advocate for his union patients, rather than as an objective arbiter of their fitness to work.

In light of the tenor of the August 2001 conversation, the fact that plaintiff transferred to Dr. Meyer shortly afterward was significant. Although plaintiff studiously avoided testifying that Dr. Ajemian had approved plaintiff's return to work, Mr. Willis's testimony that he had referred plaintiff to Dr. Meyer for "a second opinion" implied that Dr. Ajemian had done so (T. 364). Moreover, the fact that plaintiff returned to light duty five days after obtaining this second opinion implied that Dr. Meyer's partner, Dr. Yerys, had also certified plaintiff for light duty.

Dr. Meyer's testimony also supported the view that plaintiff had never been so disabled as to be unable to work. This testimony indicated that Dr. Meyer diagnosed plaintiff with only

cervical and lumbar strains at his initial, October 9, 2001, examination of plaintiff. Those strains were resolved by physical therapy by late November 2001, and Dr. Meyer certified that plaintiff could return to full duty. Significantly, as soon as it was clear that Dr. Meyer would no longer certify plaintiff's disability, plaintiff – who had been visiting orthopedists frequently since the time of his accident – suddenly had no need for treatment. Plaintiff started going to the gym three or four times a week, where he worked out on weight machines and stationary bicycles, and did not return to Dr. Meyer for over six months. On the June 2002 visit, which occurred shortly before this action was filed, plaintiff told Dr. Meyer he had "no significant neck pain," but had "residual midline back pain" (T. 198, 241). According to Dr. Meyer, the back pain was not "significantly different" than it had been in mid-2001 (T. 198-99, 241), yet plaintiff was able to work full duty and to attend the gym despite that pain.

From Dr. Meyer's testimony, the jury could infer that plaintiff – like "many" of Dr. Meyer's other patients – was attempting to "milk [his injury] for whatever it is worth" (T. 190-91). Indeed, Dr. Meyer's opinion that plaintiff was not such a patient because he "wanted to work" was undercut by plaintiff's own testimony that he had not wanted to return to work, and by the evidence that he had sought a "second opinion" from Dr. Meyer to avoid having to do so. In light of this evidence, this Court cannot find that the jury's determination that plaintiff was injured in the accident, yet not so seriously injured as to cause him to miss work, was "egregious." Accordingly, the jury's verdict was not against the weight of the evidence.

<u>Inconsistent Verdict</u>

Plaintiff's second argument is that a new trial should be granted because the verdict was internally inconsistent. Specifically, plaintiff argues that it was inconsistent "[f]or the jury to

award damages for future medical [expenses] but award no damages for future pain and suffering."  Pl. Memo at 7.  Defendant responds by arguing 1) that plaintiff waived this inconsistency argument by failing to raise it before the jury was dismissed, and 2) that the verdict was not inconsistent.  This Court concurs with defendant.

The rules concerning inconsistent verdicts are set forth in Fed. R. Civ. P. 49 and in related case law.  Rule 49 consists of two paragraphs: paragraph (a), relating to "Special Verdicts," and paragraph (b), relating to "General Verdict[s] Accompanied by Answer[s] to Interrogatories." Paragraph (b) specifically provides, in pertinent part:

> When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, judgment shall not be entered, but the court shall return the jury for further consideration of its answers and verdict or shall order a new trial.

Although Paragraph (a) contains no such instructions for resolving inconsistencies in special verdicts, the Second Circuit has repeatedly held that "judgment may not be entered pursuant to inconsistent special verdicts." *Lavoie v. Pacific Press & Shear Co*., 975 F.2d 48, 53 (2d Cir. 1992); *see Auwood v. Harry Brandt Booking Office, Inc.*, 850 F.2d 884, 890-91 (2d Cir. 1988).

"[T]here is no clear definition in [Second Circuit] caselaw of what constitutes a Rule 49(a) verdict and what constitutes a Rule 49(b) verdict." *Denny v. Ford Motor Co.*, 42 F.3d 106, 111 (2d Cir. 1994).  For this reason, among others, the Second Circuit has applied the same "familiar principles of waiver" to Rule 49(a) and Rule 49(b) verdicts alike.  *Id.*  Although these waiver principles are applied on a case-by-case basis, *id.*, a party generally waives its right to object to inconsistent verdicts unless the objection is raised before the jury is discharged.  *See Heidorf v. Town of Northumberland*, No. 96-CV-0473, 1998 WL 357319, at *3 (N.D.N.Y. June 22, 1998).

Indeed, "[w]aiver is particularly appropriate where counsel is or should be aware of the inconsistency in the verdict, and where resubmission to the jury would resolve the ambiguity," *Bseirani v. Mahshie*, 881 F.Supp. 778, 784 (N.D.N.Y. 1995), *aff'd*, 107 F.3d 2 (1997), or where "resubmission to the jury for reconsideration and clarification would remedy the inconsistency immediately and efficiently without incurring the expense of a retrial." *Trinidad v. American Airlines, Inc.*, No. 93 Civ. 4430 SAS, 1997 WL 79819, at *2 (S.D.N.Y. Feb. 25, 1997).

In this case, the alleged inconsistency should have been immediately apparent to plaintiff's counsel. Furthermore, had counsel objected before the jury was discharged, the Court could have clarified or remedied the alleged inconsistency immediately and efficiently. However, plaintiff's counsel did not object until after the jury had been discharged. Since "it is hard to see why the [plaintiff] should be allowed to sit by silently and yet be granted a new trial," *Denny*, 42 F.3d at 111, this Court holds that plaintiff has waived this inconsistent verdict argument.

Even if plaintiff had not waived this argument, this Court would find that the verdict was not inconsistent. In assessing whether a jury's answers are inconsistent, "a reviewing court must adopt a view of the case, if there is one, that resolves any seeming inconsistency." *Brooks v. Brattleboro Memorial Hosp.*, 958 F.2d 525, 529 (2d Cir. 1992) (internal quotations omitted); *see also Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 335, 364 (1962) ("Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way."). In this case, one can readily resolve the alleged inconsistency between the awarding of future medical expenses and the failure to award damages for future pain and suffering.

16

Although even defendant's expert conceded that plaintiff was injured in the collision, there was a substantial question concerning the nature and severity of the injuries caused by the accident. Plaintiff's medical witnesses testified that plaintiff had suffered herniated disks in his neck and lower back, and Dr. Chernoff testified that the herniated lumbar disk required drastic surgical intervention, costing upwards of $30,000. Defendant's medical expert, on the other hand, testified that plaintiff was suffering only "myofascial pain," which he defined as "psychologically mediated" (T. 652). Moreover, defendant's expert testified that, even if plaintiff had a "small disc herniation," the pain could be controlled by physical therapy and/or epidural injections, both of which could work "like magic" to alleviate the pain caused by such herniations (T. 693-94).

Since the jury returned a verdict of only $25,000 for future medical expenses and nothing for future pain and suffering, the jury apparently did not credit Dr. Chernoff's testimony that the accident had caused a herniation of the lumbar disk so severe as to require surgery. Rather, the jury apparently believed that plaintiff continued to suffer residual health effects from the accident, but that the effects could be controlled, completely and painlessly, by more conservative medical treatments.

There was evidence to support this view. Although both Drs. Chernoff and Hammel testified that plaintiff's June 2001 MRIs showed a herniation at C 4-5, Dr. Meyer testified that plaintiff had no significant neck pain as of June 2002, following a period of physical therapy and regular exercise at the gym. This implied that physical therapy could alleviate the pain associated with such herniations, which was entirely consistent with Dr. Hainline's testimony that physical therapy works "like magic" to resolve "small disc herniations." Moreover, plaintiff's testimony implied that this physical therapy was not at all painful; he described

massage and other apparently painless (or even pleasurable) treatments and said he felt "considerably better" afterwards (T. 518).

After plaintiff started seeing Dr. Chernoff in January 2003, plaintiff no longer went to physical therapy. The jury could infer that the subsequent deterioration in plaintiff's condition was due to the premature discontinuation of this therapy. The jury could also infer that if plaintiff resumed physical therapy and completed the course of treatment, he would realize the rapid improvement he had experienced in the year following the accident and that any accident-related injuries could be rendered entirely asymptomatic. In addition, the jury may have concluded that any pain plaintiff was currently experiencing was not attributable to the accident, but to Dr. Chernoff's refusal to prescribe physical therapy despite evidence that such therapy had eliminated plaintiff's pain in the past.

Since there is a view of the evidence to reconcile the jury's decision to award future medical expenses but not to award damages for future pain and suffering, the jury verdict was not inconsistent. *See Brooks*, 958 F.2d at 529; *see also Atlantic & Gulf Stevedores, Inc*., 369 U.S. at 364. Therefore, even if plaintiff had not waived this argument, this Court would not grant a new trial on the ground that the verdict was inconsistent.

The Motion *in Limine*

Plaintiff's third and final argument for a new trial is that this Court erred in granting defendant's second motion *in limine*, thereby precluding plaintiff from explaining that he had not yet had surgery because defendant had not yet authorized it. Under Rule 59, a court may grant a new trial if it made "substantial errors" in its evidentiary rulings. *See King v. New York City Bd. of Educ.*, No. 96-CV-2730 (JG), 2000 WL 1897349, at *2 (E.D.N.Y. Dec. 19, 2000) (quoting *Sharkey v. Lasmo*, 55 F.Supp.2d 279, 289 (S.D.N.Y. 1999), *aff'd*, 214 F.3d 371 (2d Cir. 2000)).

However, in order to obtain a new trial on this ground, a litigant must do more than merely voice a disagreement with the court's evidentiary rulings. *See Meiselman v. Byrom*, 207 F.Supp.2d 40, 44 (E.D.N.Y. 2002) ("[A] litigant's disagreement with the Court's evidentiary rulings generally is not a basis for granting a Rule 59 motion."). Rather, "[a] motion for new trial on the basis of improper evidentiary rulings will be granted only where the improper ruling affects a substantial right of the moving party." *Pace v. National Railroad Passenger Corp.*, 291 F.Supp.2d 93, 97 (D. Conn. 2003).

Although plaintiff obviously disagrees with this Court's ruling on defendant's second motion *in limine*, his motion papers do not point to evidence or controlling case law that indicates that this Court abused its discretion in excluding evidence that defendant had refused to authorize a discogram and had not yet decided whether to authorize surgery. A trial court "has considerable discretion in determining whether to admit or exclude evidence . . ., and to exclude even relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice or confusion, or by its cumulative nature." *Gierlinger v. Gleason*, 160 F.3d 858, 871 (2d Cir. 1998). While the evidence concerning the authorizations was relevant to show why plaintiff had not yet had surgery, this Court found that the slight probative value of such evidence was greatly outweighed by the unfair prejudice and potential confusion the introduction of such evidence might cause.

First, evidence concerning the medical authorizations was not essential to explain why plaintiff had not had surgery. Indeed, at the March 4, 2005, proceeding in which this Court authorized defendant to make its second motion *in limine*, plaintiff's counsel was able to succinctly explain why plaintiff had not had surgery without mentioning these authorizations:

> Mr. Litras will have to pay for it out of his own pocket and
> working pay check to pay check, he's not willing to do . . . that.

Transcript of March 4, 2005, Oral Argument, at 6. Plaintiff's testimony to this effect, which was not precluded by this Court's ruling, would have adequately explained plaintiff's failure to have surgery by implying that plaintiff could not afford it. While testimony concerning the medical authorizations would doubtless have more fully explained plaintiff's rationale, the probative value of this more detailed explanation was minimal.

In contrast to this slight probative value, the risk of undue prejudice to defendant and of confusing the jury was substantial. Evidence that the defendant had refused to authorize a discogram and had yet to even reach a decision on whether to authorize surgery portrayed defendant as an uncaring bureaucracy. In order to dispel that image, defendant's counsel would have wanted to explain the delays and the decision to refuse plaintiff a discogram. Thus, introduction of evidence concerning the authorizations might have engendered a mini-trial on the propriety of defendant's action, which would have related to the very issue – whether such procedures were necessary – which was before the jury for determination. The jury would have had to distinguish between evidence relating to the propriety of defendant's decision and very similar evidence concerning plaintiff's need for surgery. The potential for confusion was great.

In addition, the propriety of defendant's decision concerning the authorizations was not properly before the jury, for the complex reasons set forth in defendant's second motion *in limine*. If the parties addressed these authorizations in any detail, the jury might not have understood the very limited purpose for which the evidence was being introduced, despite limiting instructions or other attempts by this Court to explain it. Since the risks of confusion

and undue prejudice substantially outweighed the probative value of this evidence, this Court decided to preclude any mention of the authorizations.

Moreover, even if this ruling was an abuse of discretion, it did not affect a substantial right of plaintiff's. "The 'substantial rights of the parties' can only be affected by an erroneous evidentiary ruling if 'it is likely that in some material respect the factfinder's judgment was swayed by the error.'" *303 West 42ⁿᵈ St. Enterprises v. Internal Revenue Service*, No. 93 Civ. 4483 LBS, 2000 WL 666339, at *10 (S.D.N.Y. May 22, 2000) (quoting *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 150 (2d Cir. 1997)). In this case, this Court's evidentiary ruling did not deprive plaintiff of a substantial right.

As noted above, this Court ruling did not preclude plaintiff from explaining that he had not had the surgery because he could not afford it. Testimony concerning defendant's failure to authorize the surgery was unnecessary to explain the financial reasons for not having surgery; these reasons were obvious. Dr. Chernoff testified that the surgery cost upwards of $30,000 and necessitated a lengthy recuperation. The jury heard ample testimony concerning plaintiff's earnings history, the fact that plaintiff's compensation was calculated by the hours (or sometimes the minutes) he worked, and the hardship he allegedly suffered as a result of the diminution in his earning capacity caused by his inability to work overtime. This testimony clearly set forth the financial obstacles to surgery, and implied that plaintiff needed the jury to award him the money to pay for it.

Finally, there is nothing to suggest that the jury would have been swayed in any way by the precluded testimony. This case involved conflicting expert testimony concerning the nature of plaintiff's injuries and the cause of those injuries. As discussed above, the verdict indicates that the jury believed that the injuries attributable to the accident were relatively minor and could

be resolved through conservative treatment. Since the jury apparently did not credit Dr. Chernoff's testimony that plaintiff was so seriously injured as to necessitate the drastic surgery that Dr. Chernoff recommended, the jury's verdict would not have been changed by testimony concerning the defendant's failure to authorize this surgery. Indeed, that evidence would have further supported the jury's conclusion that surgery was unnecessary by implying that defendant's doctors also did not credit Dr. Chernoff's claims concerning the need for surgery.

Since this Court did not abuse its discretion in precluding the evidence concerning plaintiff's requests for medical authorizations and, in any event, did not deprive plaintiff of a substantial right, plaintiff is not entitled to a new trial on this basis.

## CONCLUSION

For the reasons stated above, plaintiff's motion for a new trial pursuant to Fed. R. Civ. P. 59 is denied.

**SO ORDERED.**

_____/s/_____
SANDRA L. TOWNES
United States District Judge

Dated: Brooklyn, New York
       May 19, 2006